IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| ANITA LINGO | § | |
| v. | § | CIVIL ACTION NO. 2:12cv349 |
| COMMISSIONER, SOCIAL SECURITY ADMINISTRATION | § | |

MEMORANDUM OPINION AND ORDER

On June 18, 2012, Plaintiff initiated this civil action pursuant to the Social Security Act (The Act), Section 205(g) for judicial review of the Commissioner's denial of Plaintiff's application for Social Security benefits. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in the proceeding pursuant to 28 U.S.C. § 636(c).

**I.     HISTORY**

On November 13, 2009, Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits and protectively filed a Title XVI application for supplemental security income benefits. She claimed that since September 2, 2008, she had been unable to work due to pain in her lower back as well as tendonitis and carpal tunnel syndrome in her right arm and hand. After a hearing, the ALJ denied benefits on February 23, 2011, finding that Plaintiff could perform her previous job as a front desk clerk because she could do light work. Alternatively, the ALJ determined that Plaintiff could perform other light-duty jobs existing in the national and local economy.

Plaintiff appealed this decision to the Appeals Council, which denied the request for review. Thus, the ALJ's decision serves as the Commissioner's final administrative decision for purposes of judicial review pursuant to 42 U.S.C. §405(g). *See Sims v. Apfel*, 530 U.S. 103, 106-07, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000). Plaintiff then filed the instant action for review by this Court.

## II.    STANDARD

Title II of the Act provides for federal disability insurance benefits.  Title XVI of the Act provides for supplemental security income for the disabled.  The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  See *Davis v. Heckler*, 759 F.2d 432, 435, n.1 (5th Cir. 1985); *Rivers v. Schweiker*, 684 F.2d 1144, 1146, n. 2 (5th Cir. 1982); *Strickland v. Harris*, 615 F.2d 1103, 11055th (5th Cir. 1980).

Judicial review of the  denial of disability benefits under section 205(g) of the Act, 42 U.S.C. § 405(g), is limited to "determining whether the decision is supported by substantial evidence in the record and whether the proper legal standards were used in evaluating the evidence." *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990)); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (per curiam).  A finding of no substantial evidence is appropriate only where there is a conspicuous absence of credible choices or no contrary medical evidence.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).  Accordingly, the Court "may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute [the Court's] judgment for the [Commissioner]'s, even if the evidence preponderates against the [Commissioner]'s decision." *Bowling*, 36 F.3d at 435 (quoting *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988)); *see Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993); *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Rather, conflicts in the evidence are for the Commissioner to decide.  *Spellman*, 1 F.3d 357, 360 (5th Cir. 1993) (citing *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990)); *Anthony*, 954 F.2d 289, 295 (5th Cir. 1992) (citing *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983)).  A decision on the ultimate issue of whether a claimant is disabled, as defined in the Act, rests with the Commissioner.  *Newton v. Apfel*, 209 F.3d 448, 455-56 (5th Cir. 2000); Social Security Ruling ("SSR") 96-5p.

"Substantial evidence is more than a scintilla but less than a preponderance – that is, enough that a reasonable mind would judge it sufficient to support the decision." *Pena v. Astrue*, 271 Fed.Appx. 382, 383 (5th Cir.2003) (*citing Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir.1994)). Substantial evidence includes four factors: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability; and (4) the plaintiff's age, education, and work history. *Fraga v. Bowen*, 810 F.2d 1296, 1302 n.4 (5th Cir. 1987). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971). However, the Court must do more than "rubber stamp" the ALJ's decision; the Court must "scrutinize the record and take into account whatever fairly detracts from the substantiality of evidence supporting the [Commissioner]'s findings." *Cook*, 750 F.2d 391, 393 (5th Cir. 1985). The Court may remand for additional evidence if substantial evidence is lacking or "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42. U.S.C. § 405(g) (2000); *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994).

A claimant for disability has the burden of proving a disability. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality which is demonstrable by acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

In order to determine whether a claimant is disabled, the Commissioner must utilize a five-step, sequential process. *Villa*, 895 F.2d at 1022. A finding of "disabled" or "not disabled" at any step of the sequential process ends the inquiry. *Id.*; *see Bowling*, 36 F.3d at 435 (citing *Harrel*, 862 F.2d at 475). Under the five-step sequential analysis, the Commissioner must determine at Step One whether the

claimant is currently engaged in substantial gainful activity. At Step Two, the Commissioner must determine whether one or more of the claimant's impairments are severe. At Step Three, the Commissioner must determine whether the claimant has an impairment or combination of impairments that meet or equal one of the listings in Appendix I. Prior to moving to Step Four, the Commissioner must determine the claimant's Residual Functional Capacity ("RFC"), or the most that the claimant can do given his impairments, both severe and non-severe. Then, at Step Four, the Commissioner must determine whether the claimant is capable of performing her past relevant work. Finally, at Step Five, the Commissioner must determine whether the claimant can perform other work available in the local or national economy. 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f). An affirmative answer at Step One or a negative answer at Steps Two, Four, or Five results in a finding of "not disabled." *See Villa*, 895 F.2d at 1022. An affirmative answer at step three, or an affirmative answer at steps four and five, creates a presumption of disability. *Id.* To obtain Title II disability benefits, Plaintiff must show that she was disabled on or before the last day of her insured status. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir.1981), *cert. denied*, 455 U.S. 912, 102 S. Ct. 1263, 71 L. Ed. 2d 452 (1982). The burden of proof is on the claimant for the first four steps, but shifts to the Commissioner at Step Five if the claimant shows that she cannot perform her past relevant work. *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989) (per curiam).

## III. ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ made the following findings in his March 21, 2011, decision:

The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

The claimant has not engaged in substantial gainful activity since September 2, 2008, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, arm pain, and chronic obstructive pulmonary disease (COPD) (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except she can no more than occasionally climb ramps and stairs, stoop, kneel, and crouch. She should work in a relatively clean environment avoiding concentrated exposure to dust, fumes, and other pulmonary irritants. She cannot perform work requiring the repetitive use of her hands and can do no more than frequent handling and fingering with her hands.
>
> The claimant is capable of performing past relevant work as a front desk clerk, which is light semi-skilled work (DOT 238.367-038). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565 and 416.965).
>
> The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

Tr. at 18-24. The ALJ determined that Plaintiff was not disabled under sections 216(i) and 223(d) (period of disability and disability insurance benefits) or section 1614(a)(3)(A) (supplemental security income benefits) of the Social Security Act.

Although the ALJ determined that Plaintiff was not disabled because she could perform her past relevant work as a front desk clerk, he went on to consider Step Five of the sequential evaluation. At this step, in the alternative, the ALJ determined that there were other jobs which Plaintiff could perform that existed in significant numbers in the national and local economy, such as gate guard and information clerk.

## IV. DISCUSSION

### A. Plaintiff's Claims and Testimony

In her brief, Plaintiff raises three claims, set forth as follows:

1.   The ALJ underestimated Plaintiff's limitations due to her back injury because he did not give sufficient weight to the opinions of the physicians who treated and examined Plaintiff for her back injury;

2.   The ALJ underestimated Plaintiff's limitations due to her carpal tunnel syndrome and tendonitis because he did not give sufficient weight to the opinions of the physicians who examined Plaintiff and diagnosed her with those impairments;

3.   Because he did not properly evaluate the opinion evidence of the medical sources, the ALJ did not give sufficient weight to the opinion of Plaintiff's treating doctor, Y. Nguyen Pham, M.D., that she could not lift more than five pounds consistently and was disabled.

At the administrative hearing, Plaintiff's attorney, Paul Turner, gave a short summary about the case. He said that Plaintiff stopped working in 2008 due to problems with her arm, but that she is insured through 2013. She injured her back in the late 1990's and had two back surgeries, but continued to work until her arm trouble forced her to quit.

After stating that Plaintiff could not work because of carpal tunnel syndrome, lower back pain, and COPD, Turner said that Plaintiff had undergone a full laminectomy (removal of a portion of the vertebral bone called the lamina) and a lumbar fusion with instrumentation in 1999. At that time, she was listed as having an 18 percent whole-body impairment before being released back to work.

Plaintiff was subsequently treated by Dr. Pham for her back as well as for COPD. She was diagnosed with carpal tunnel syndrome or tendinitis in her right arm in 2008. The Texas Workforce Commission advised her that they could not pay her unemployment benefits because she is not able to work due to a physical condition.

After Turner's opening statement, Plaintiff was placed under oath to testify. She stated that she stopped working because of her arm, explaining that " I was at work doing my job and all of the [sic] sudden I couldn't use it. I couldn't, it was just horrible. I was in so much pain I was crying and I went over to my supervisor. At 10:00 that morning I asked her if I could take my lunch hour early so I could go to the emergency room, because I was not supposed to go until 11:00. She let me go."

Plaintiff went on to state that at the emergency room, she was told that she had carpal tunnel and tendinitis in her arm and that she needed to see an orthopedic surgeon. However, she could not see an orthopedic surgeon because she lost her job and insurance.

Plaintiff stated that at that time, she was working in the county courthouse doing mail-outs of documents which people sent in. She explained that after the documents were recorded and scanned, they were put into envelopes and sent back to the owners. She had worked at the front counter of the office, which involved waiting on customers, taking money, and working on the computers when people got a marriage license or wanted a birth certificate. However, Plaintiff said that she had difficulty doing this job because it involved a lot of standing.

Prior to the date of her arm injury, Plaintiff stated that she had not had problems with her arm, but that she has had problems since this injury. Plaintiff explained that she "dropped things" and that she has to do things like picking up the milk in the refrigerator with both hands. The problem is primarily in her right arm, which makes it more difficult because she is right-handed, although she indicated that she had pain in her left hand as well. Plaintiff stated that she has problems opening jars but not using a can opener, and that she would have problems doing something like counting out change.

Plaintiff stated that her back hurts "every day all the time" and that it was hurting right then. Her legs were tingling at the hearing because she did not have enough time to stand up and walk around; she explained that if she sat for long periods of time, her legs would turn numb and start tingling. She has problems going up stairs because she has to pause at the top and wait before she can move forward. She does not have a car and is not a good driver, but sometimes could not drive at all because she can only hold her right leg down

After stating that her back has been getting worse since she worked at the motel in 2005, Plaintiff stated that she has a prescription for pain pills from Dr. Pham, but has not been able to get it filled. He did not treat her daily but gave her the prescription for Darvocet.

Plaintiff said that she had two inhalers for her breathing problems, including one called Symbicort to use twice a day as well as a rescue inhaler. She did have these and they helped, but it did not fix the problem. She used the rescue inhaler "sometimes twice, maybe, a day" but the Symbicort was the main one; if she used the Symbicort the first thing in the morning, she tries as much as she can not to use the rescue inhaler. Plaintiff conceded that she smokes, but said that it was less than a pack a day and she is trying to quit.

On a normal day, Plaintiff said that she gets up, takes a shower, and tries to do things around the house. She tries to get laundry done but seldom sweeps or mops because it hurts her back and she cannot pick up a bucket of water. She can put laundry in the washer and take it out a few pieces at a time to put in the dryer.

When questioned by counsel, Plaintiff stated that she worked as a desk clerk in a motel from 2005 to 2007. She missed some work there because of breathing problems and her back; she started the job cleaning rooms but she couldn't do that, so they put her in the office. Often, however, there was no chair or stool and she was not able to sit down. She ended up losing this job because she missed too many days of work.

Willa Burton, Plaintiff's mother, testified that she had breast cancer in 2009 and could not take care of herself, so she asked Plaintiff to move in with her. She has seen Plaintiff fall and drop things. On other occasions, Burton and Plaintiff would go to see Plaintiff's grandmother in a nursing home, and Plaintiff would have to drive, but by the time they got there, Plaintiff's legs were numb and she had difficulty driving because she had to take her right arm off the wheel and drive with one hand. Burton said that sometimes Plaintiff simply could not drive her to the nursing home or for radiation treatment so they would have to get friends to drive them.

Burton again stated that she saw Plaintiff drop things and that Plaintiff could not sweep. Plaintiff also had difficulty taking baths and standing up to cook meals. When they went to see Burton's youngest daughter, who lived two and a half hours away, they had to stop so that Plaintiff could get out to take a break and move her legs around.

Counsel asked for 30 days to supplement the medical records, and the ALJ agreed. Following this, vocational expert Charles Smith testified. Smith stated that Plaintiff's past work included a stint as a front desk clerk, light physical demand, semi-skilled, SVP four, classification code 238.367-038. She also worked as a bank teller, light physical demand, SVP five, skilled, classification code 211.362-018. Plaintiff had worked as an order puller, medium physical demand, SVP two, unskilled, classification code 203.582-054, and as a police clerk, which is the job Plaintiff described as being with the county clerk's office. This job is listed as sedentary physical demand, SVP six, skilled, classification code 375.362.010. The job which Plaintiff described as being at the counter helping people which such things as marriage licenses was described as a license clerk, which is light physical demand, SVP three, semi-skilled, classification code 205.367-034.

The ALJ then posed some hypotheticals to Smith, all of which assumed a person of Plaintiff's age, education, and work experience. In the first hypothetical, the ALJ posited a person who can do no more than light work and was restricted to no more than occasional climbing ramps or stairs, stooping, kneeling, and crouching. This individual also cannot do repetitive motion or work with their hands and must work in a relatively clean environment. Smith testified that the hypothetical person could do all of Plaintiff's past relevant work except for the order puller job. This hypothetical person could also work as an information clerk or a receptionist.

The second hypothetical involved the same facts as the first except that handling and fingering was reduced to no more than occasional. Smith stated that "the past relevant work would not be available," but the receptionist and information clerk jobs only require occasional reaching and handling and thus would be available to this hypothetical person. Another job which would be available would be as a gate guard.

The third hypothetical involved the same facts as the second except for the addition of a sit/stand option every hour. Smith stated that the jobs of receptionist, information clerk, and gate guard would still be available to that hypothetical person.

The fourth hypothetical involved all of the same restrictions as in the third, with the addition of the fact that the person would be required to miss more than two days per month due to health conditions. Smith stated that positions would not be available for that hypothetical person. He added that if the total number of breaks, excluding the lunch break, exceeds five in an eight-hour period, work becomes meaningless for that individual.

In response to questioning by counsel, Smith stated that two extra breaks, for a total of four in a day, of no more than 10 to 15 minutes, would be acceptable. He acknowledged that this was based on his training and expertise and that he had no treatise or document to back it up. Smith explained that examples of an "information clerk" would be someone who worked in a travel center, a library, or an information desk in the shopping mall.

Plaintiff testified that if she sat for an hour, she would need to take a 20 to 30 minute break by standing, and if she stood for a hour, she would need to take a 20 to 30 minute break by sitting. Smith stated that his testimony was consistent with the Dictionary of Occupational Titles.

### B. The Medical Records

The medical records show that in July of 1997, Plaintiff injured her back. She underwent two back surgeries in 1999. Although she made adequate progress, her doctors at that time opined that she had 15 to 18 percent impairment to her body as a whole. (Tr. 290). After these surgeries but before the relevant period, Plaintiff worked as an order entry clerk for a printing company, a desk clerk at a motel, and a deputy clerk at a county courthouse. (Tr. 153).

Between June of 2006 and July of 2008, Plaintiff was treated on a number of occasions by Dr. Pham. Her complaints included intermittent back pain, anxiety, COPD, a dog bite, tiredness, a sore throat, and pain resulting from a slip and fall on some ice. Dr. Pham prescribed various medications including Xanax (for anxiety), Flagyl (an antibiotic), Phenergan (for nausea and vomiting), Albuterol (for breathing problems and asthma), and Symbicort (for asthma).

On September 2, 2008, Plaintiff went to the emergency room at the Marshall Regional Medical Center, where she saw Dr. James Nichols with a complaint of moderate pain in her right arm with tingling and numbness. (Tr. 255). An examination found that her hands and wrists were normal, her right forearm was tender with a limited range of motion, and she had a positive Phalen's sign, an indicator of carpal tunnel syndrome. Dr. Nichols gave her educational materials on tendinitis and carpal tunnel syndrome as well as a prescription for a pain medication called ibuprofen, and told her to follow up with a physician named Dr. Douglas Waldman. However, Plaintiff states that she did not do so because she lost her job and insurance shortly afterwards. After she lost her job, she was denied unemployment because the Texas Workforce Commission determined that she could not work due to a physical condition.

Plaintiff's next medical examination was on April 1, 2010, when she saw Dr. Sita Devulapalli for a consultative exam. (Tr. 269). She told Dr. Devulapalli that she had low back pain for the past 12 years, causing numbness in her legs and limiting her ability to sit, stand, or walk for extended

periods. She also complained of pain, tingling, and numbness in both hands, with the right hand being worse.

Dr. Devulapalli found that Plaintiff had normal blood pressure and weight, appropriate affect, no edema, good pulses, normal chest sounds, normal strength in her upper and lower extremities, normal muscle tone and no atrophy in her extremities, normal reflex activity, normal gait, negative straight leg raises (indicating the absence of a herniated disc) and she could maneuver without difficulty. Dr. Devulapalli also found positive Tinel's signs in both wrists (indicating possible carpal tunnel syndrome), tenderness in her elbow joints, muscle spasms in her lower spine, and the ability to bend forward 40 degrees. He diagnosed her with low back pain secondary to degenerative disc disease, carpal tunnel syndrome, and tendinitis in the bilateral elbow joints.

On May 19,2010, Dr. Laurence Ligon, a state agency expert, completed a physical residual functional capacity assessment of Plaintiff. (Tr. 277) Based primarily upon the examination of Dr. Devulapalli, Dr. Ligon opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand or walk, with normal breaks, for six hours of an right-hour day, and sit, with normal breaks, for six hours of an eight-hour day.

In August of 2010, Plaintiff saw Dr. Pham because she was applying for disability. (Tr. 335). Dr. Pham found that her hand grip was 5-/5 for her left hand and 4-/5 for her right hand, her hip flexion was 4/5 bilaterally, and her knee extension was 4-/5 bilaterally. He found tendinitis in her right shoulder and elbow, a positive Phalen's test in her right wrist, but a negative Tinel's test. Dr. Pham diagnosed carpal tunnel syndrome, a low back injury, and anxiety; he prescribed a wrist brace, ibuprofen, Xanax, and Symbicort, and advised Plaintiff to stop smoking.

Two weeks after this exam, on August 18, 2010, Dr. Pham wrote a letter at the request of Plaintiff's counsel (Tr. 286). This letter reads as follows:

> Mrs. Anita Lingo was seen back in our clinic on August 5, 2010. Her last office visit was in 2008. Apparently she had lost her job and her health insurance and so was not able to come back to see me. She reports that she was laid off when her arm/wrist pain became so bad that she could not perform her job. Her exam today showed marked weakness in her right hand consistent with carpal tunnel syndrome, as well as tendinitis in her right shoulder. I estimate that she can not lift more than 5 lbs consistently or

perform repetitive motions (such as writing or typing). Ms. Lingo is right handed, so I can not imagine how she can obtain gainful work at this point.

As an additional note, Ms. Lingo also has a history of COPD and low back problems. She had visited my clinic multiple times prior to 2008 due to exacerbations of her emphysema. She reports having shortness of breath with walking long distances or climbing stairs. I had planned to test her pulmonary functions to determine the extent of lung damages, but she does not have the funding to pay for the testing. With regard to her back pain, I do not have records of it since the surgery was several years ago.

### C. The Plaintiff's Issues

#### 1. The Back Injury

Plaintiff's first claim is that the ALJ underestimated her limitations due to her back injury because he did not give sufficient weight to the opinions of the physicians who treated and examined Plaintiff for her back injury. Instead, she says, the ALJ gave considerable weight to the opinion of Dr. Ligon, who did not examine her. Plaintiff also asserts that Dr. Ligon considered only a fraction of the medical records, and in fact did not consider the medical records from Dr. Pham or the records concerning Plaintiff's surgery in 1999, and that Dr. Ligon offered no basis or explanation for his conclusions.

Plaintiff likewise says that the ALJ did not consider the medical records from 1999, including the finding of an 18 percent impairment with which she says that Dr. Pham agreed. She states that the ALJ sought to justify this decision because Plaintiff had worked since that time and because of the amount of time which had elapsed. However, Plaintiff argues that her employment after November of 1999 does not undermine the validity of this impairment rating because there is no evidence that this impairment rating meant should could not do any of the jobs which she held after 1999. Alternatively, Plaintiff argues that it is possible her impairment rating improved since November of 1999, pointing out that her treating physician, Dr. Zum Brunnen, did not believe that she had reached maximum medical improvement; however, the ALJ did not seek clarification from Dr. Zum Brunnen.

Plaintiff goes on to argue that this impairment rating and her employment history after 1999 confirm that she had a permanent impairment to her back despite these surgeries. She points to the medical records showing that she could not bend forward more than 40 degrees and had muscle spasms

in her lower spine and states that the ALJ failed to consider objective findings on the X-rays including the slight retrolisthesis of L3 on L4 and the posterior fusion at L4-L5.

The Commissioner maintains that the ALJ properly weighed and discounted the opinions of Dr. Zum Brunnen and another physician named Dr. Greenspan because of the remote dates of these opinions and Plaintiff's work history after the opinions. These physicians had been involved with Plaintiff's back surgery in 1999, some nine years prior to the relevant period, and Plaintiff worked for several years after these opinions were rendered.

The Commissioner further argues that substantial evidence supports the finding that Plaintiff was not disabled and that substantial evidence supports the RFC determination. First, the Commissioner points to the objective medical findings by Dr. Devulapalli that Plaintiff had normal power in all of her extremities, a normal gait, and normal X-rays of her right elbow as evidence that she could perform light duty.

In addition, the Commissioner asserts that the medical records of Dr. Pham's examinations of Plaintiff also support the RFC determination. While Dr. Pham was Plaintiff's treating physician from 2006 through 2008, he did not treat her for low back pain, and she only mentioned intermittent back pain to Dr. Pham once, in 2006. On September 18, 2007, Plaintiff stated that she was in no pain. At her last appointment with Dr. Pham, on July 28, 2008, Dr. Pham stated that Plaintiff's COPD was improving and cleared her to return to work with "no restrictions."

With regard to Dr. Pham's August 2010 letter, the Commissioner states that the ALJ properly discounted the opinions expressed in the letter because these were not consistent with the objective medical findings in Dr. Devulapalli's April 2010 consultative exam or with Dr. Pham's own previous examinations. In addition, the Commissioner states that a conflict exists between the opinions expressed in the letter and Dr. Devulapalli's exam, and that when a conflict exists, it is the responsibility of the ALJ to weigh the evidence, resolve conflicts in the evidence, and decide the case.

In this case, the Commissioner says, the ALJ properly discounted the estimate that Plaintiff could lift no more than five pounds because it was inconsistent with Dr. Devulapalli's determination that Plaintiff had normal strength. Dr. Pham's estimate was also inconsistent with Plaintiff's

statements to him that she could do light cleaning and laundry, wash dishes, and "lift no more than 20 pounds." Finally, the Commissioner contends that the ALJ properly discounted Dr. Pham's statement that "I cannot imagine how she can obtain gainful work at this point" because this is nothing more than a conclusory statement of disability.

In her reply brief, Plaintiff states that impairment ratings are intended to be permanent, but that the Commissioner nonetheless ignores her 1999 impairment rating because it is outside the relevant time period. She argues that the fact she worked after receiving this rating is of no moment because there is no evidence showing that this rating would have prevented her from doing any of the jobs she held since 1999. Plaintiff also points out that she complained of back pain to Dr. Pham on January 31, 2008 and that the term "intermittent" in the medical records indicated that she suffered from "periodic bouts of back pain."

The Commissioner's sur-reply states that Plaintiff's complaint of back pain in January of 2008 was the result of a fall on some ice and that Plaintiff did not allege disability as a result of this fall. One month later, in February of 2008, Plaintiff saw Dr. Pham and no mention was made of the slip and fall or any back pain.

### 2. Carpal Tunnel

Plaintiff states that Dr. Nichols, Dr. Pham, and Dr. Devulapalli also concluded that Plaintiff had carpal tunnel syndrome and tendinitis, based on positive results on Tinel's test and Phalen's test. The ALJ stated at one point in his decision that "there is no indication that the diagnosis of carpal tunnel was confirmed by any objective tests, such as nerve conduction studies." Thus, the ALJ stated that Plaintiff's arm pain is "more properly characterized as non-specific arm/hand pain," but noted that "the functional limitations associated with this condition have been considered in determining Plaintiff's residual functional capacity."

Despite stating that Plaintiff's arm pain is more properly characterized as non-specific arm/hand pain, however, the ALJ went on to say that "the consultative examiner's diagnoses were low back pain secondary to degenerative disc disease, carpal tunnel syndrome and tendinitis in the bilateral

elbow joints. The undersigned has reviewed this evidence and finds it to be well supported by objective tests and direct observation and it is therefore afforded significant weight."

The Plaintiff contends that the Tinel's and Phalen's tests are objective medical evidence showing that she suffered from carpal tunnel syndrome, but that the ALJ improperly discounted these. Although the ALJ's errors may appear harmless, Plaintiff argues that the ALJ did not mention tendinitis in formulating the RFC and the ALJ did not state how Plaintiff could be incapable of repetitive use of hands but could perform "frequent handling and fingering." Plaintiff states that the ALJ "fails to explain how he determined this mild functional limitation," but avers that the ALJ "probably underestimated the extent of Plaintiff's residual functional capacity due to her carpal tunnel syndrome and tendinitis."

The Commissioner contends that the term used to describe the impairment doesn't matter, but that what matters is that the ALJ properly considered how Plaintiff's impairments limited her ability to perform basic work activities. The Commissioner characterizes the argument as one of "semantics," noting that the ALJ stated that "the functional limitations associated with this condition have been considered in formulating [Plaintiff's] residual functional capacity."

### 3. Discounting the Opinion of the Treating Physician

Plaintiff states that the ALJ did not properly consider the opinions of Dr. Pham as expressed in the August 2010 letter. She notes that while Dr. Pham said that he did not see her between 2008 and 2010, the ALJ claimed that Plaintiff was seen in the Marshall Internal Medicine Clinic between 2008 and 2010; however, Plaintiff says that the ALJ's statement was in error.

The ALJ said that except for Dr. Pham, none of the treating physicians who saw her indicated any specific functional limitations, but Plaintiff maintains that Dr. Pham was her only treating source since 2006. Plaintiff complains that the ALJ rejected Dr. Pham's August 2010 opinion that she could not lift more than five pounds or perform repetitive actions such as typing or writing, but that there were objective medical records supporting this conclusion, including the Tinel's and Phalen's tests confirming that Plaintiff had carpal tunnel syndrome. Plaintiff claims that the only doctor to controvert

this was Dr. Ligon, who never examined her, did not explain the basis for his findings, and did not consider all of the medical records in evidence at the time that the decision was rendered. Plaintiff contends that the ALJ "gave more weight to Dr. Ligon than Dr. Pham."

Plaintiff also points to Dr. Pham's opinion that he did not believe she could obtain gainful work. While Plaintiff concedes that the Commissioner is ultimately responsible for deciding if a person is disabled, Plaintiff states that "opinions from a medical source, especially a treating source, must never be ignored." She complains that the ALJ "summarily dismissed" Dr. Pham's statement, but that if the rationale for this opinion was deficient or incomprehensible, the ALJ should have contacted Dr. Pham for clarification. In addition, because the ALJ's order did not give controlling weight to Dr. Pham's opinion, Plaintiff says that the ALJ should have undertaken the analysis prescribed in 20 C.F.R. 404.1527(c)(2) concerning factors to be examined relative to the probative value of Dr. Pham's opinion. Finally, Plaintiff says that the opinion was consistent with that of the Texas Workforce Commission, whose finding should have been considered by the ALJ.

The Commissioner responds that the ALJ properly discounted Dr. Pham's opinions in the August 2010 letter because these opinions were not consistent with Dr. Devulapalli's objective findings in April of 2010 or with the previous medical records from Dr. Pham. Although Plaintiff argues that the ALJ did not give sufficient weight to Dr. Pham's opinion, the Commissioner maintains that it is the function of the ALJ to resolve conflicts in the evidence. Furthermore, the Commissioner states that the ALJ may reject a physician's opinion when the evidence supports a contrary conclusion.

In this case, the Commissioner states that the ALJ discounted Dr. Pham's estimate that Plaintiff could not lift more than five pounds because it was inconsistent with Dr. Devulapalli's opinion that Plaintiff had "normal strength." There was a conflict between Dr. Pham's findings and Dr. Devulapalli's findings concerning Plaintiff's strength, the ALJ resolved the inconsistency in favor of Dr. Devulapalli. In addition, the Commissioner observes that the medical records of Plaintiff's visits with Dr. Pham showed no evidence of disabling back pain or uncontrolled COPD, and that a 20 C.F.R.

404.1527(c)(2) analysis was not required because Dr. Devulapalli's examination provided first-hand medical evidence contradicting Dr. Pham's opinion.

In her reply brief, Plaintiff points to a letter which counsel sent to Dr. Devulapalli on March 6, 2013. In this letter, counsel states that he asked Crystal Jackson in Dr. Devulapalli's office if the power portion of the neurological exam was evidence of how much weight Plaintiff would lift, and Jackson said that it was not. Counsel asked if Dr. Devulapalli agreed with this statement, and the doctor signed a line on the letter stating that he agreed. The Commissioner objected to this new evidence, stating that the Court's review is limited to the administrative record before the Commissioner on February 23, 2011 and that the Plaintiff has failed to show good cause why a similar statement from Dr. Devulapalli could not have been included in the evidence provided to the ALJ. In addition, the Commissioner argues that the letter is not material because the totality of the evidence supported the RFC determination made by the ALJ.

## V. ANALYSIS

The Plaintiff's first claim is that the ALJ underestimated Plaintiff's limitations due to her back injury because he did not give sufficient weight to the opinions of the physicians who treated and examined Plaintiff for her back injury.

The medical records show that Dr. Devulapalli examined Plaintiff in April of 2010 and found that she had normal gait and could get on the examining table without difficulty, although she did have difficulty in tandem walking or walking on her toes and heels. She had no kyphosis or lordosis in her back, although she did have muscle spasms and could bend forward 40 degrees. Her straight leg raise test was negative for any tenderness, indicating no herniated disc. X-rays of Plaintiff's back found exaggerated lordotic curvature of the spine and signs of her prior back surgery with no compression fracture, and X-rays of her right elbow were normal.

In May of 2010, a residual functional capacity assessment was carried out by Dr. Laurence Ligon. Dr. Ligon did not examine Plaintiff, but relied heavily on the findings made by Dr. Devulapalli; in fact, Dr. Ligon's "additional comments" repeat Dr. Devulapalli's findings verbatim.

Dr. Ligon concluded that Plaintiff could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds. He stated that Plaintiff could stand or walk up to six hours, with normal breaks, in an eight hour day and could sit, with normal breaks, up to six hours in an eight-hour day. Her capacity for pushing and pulling was unlimited, other than the restrictions on lifting and carrying, and she had no postural, manipulative, visual, or communicative limitations.

Dr. Devulapalli's findings support the RFC findings of the ALJ and amount to "substantial evidence" to support the decision of the Commissioner. *Falco*, 27 F.3d at 162 (5th Cir.1994) (noting that substantial evidence means that evidence which is "enough that a reasonable mind would judge it sufficient to support the decision.") In determining substantial evidence, the court may not reweigh the evidence in the record, try the issues *de novo*, or substitute the Court's judgment for that of the Commissioner, even if the evidence may preponderate against the Commissioner's decision. *Bowling*, 36 F.3d at 435.

Plaintiff points to the medical evidence furnished by Dr. Pham, but much of this evidence does not contravene the Commissioner's findings. Between 2006 and 2008, Plaintiff complained to Dr. Pham of back pain on only two occasions, one of which involved a slip and fall on some ice rather than a long-term disabling condition, and a month after this fall, Plaintiff was seen again by Dr. Pham and made no complaint about her back. When Dr. Pham cleared her to return to work in 2007, this was with "no restrictions."

To the extent that Dr. Pham's August 2010 letter may offer a contrary opinion, the Fifth Circuit has made clear that conflicts in the evidence are for the Commissioner to decide. *Spellman*, 1 F.3d at 360. Dr. Pham's letter says only that Plaintiff has "a history of low back problems." This conclusory assertion does not contravene the ALJ's residual functional capacity assessment or the determination that Plaintiff was capable of light duty. Plaintiff's first ground for relief is without merit.

Plaintiff's second claim is that the ALJ underestimated her limitations due to her carpal tunnel syndrome and tendinitis because he did not give sufficient weight to the opinions of the physicians who examined Plaintiff and diagnosed her with those impairments. Although the ALJ used the more

non-specific term "arm pain" rather than identifying the condition as carpal tunnel syndrome, the ALJ also gave "significant weight" to Dr. Devulapalli's diagnoses, which included a diagnosis of carpal tunnel syndrome. Furthermore, with relation to the determination of "arm pain," the ALJ stated that "the functional limitations associated with this condition have been considered in formulating her residual functional capacity."

Although Dr. Devulapalli diagnosed Plaintiff with carpal tunnel syndrome based on positive Tinel's tests in both wrists, he found that Plaintiff's upper extremities had normal power, normal tone with no atrophy, and reflex activity of 2+, which is normal. Her senses of touch, pain, and vibration were intact in both hands. Based on the findings made by Dr. Devulapalli, Dr. Ligon concluded that Plaintiff could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds, that her capacity for pushing and pulling was unlimited, other than the restrictions on lifting and carrying, and she had no manipulative limitations. Dr. Devulapalli's findings constitute substantial evidence to support the residual functional capacity determination of the ALJ.

Dr. Pham's letter of August 18, 2010 states that Plaintiff had "marked weakness" in her right hand. He estimated that she could lift no more than five pounds consistently or perform repetitive motions such as writing or typing. The conflict with Dr. Devulapalli's findings was resolved by the ALJ in favor of Dr. Devulapalli, and the Court cannot second-guess this determination. *Bowling*, 36 F.3d at 435; *Spellman*, 1 F.3d 357, 360 (5th Cir. 1993) (conflicts in the evidence are for the Commissioner to decide). In addition, as the Commissioner observes, Plaintiff's records indicate that she was able to perform such tasks as washing laundry and dishes, and Plaintiff once told Dr. Pham that she could lift "no more than 20 pounds." Because the ALJ's determination was supported by substantial evidence, that determination must be upheld. *Villa*, 895 F.2d at 1021.

Plaintiff's third contention is that because the ALJ did not properly evaluate the opinion evidence of the medical sources, he did not give sufficient weight to the opinion of Dr. Pham that she could not lift more than five pounds consistently and was disabled. She argues that because the ALJ did not give controlling weight to Dr. Pham's opinion, the ALJ was required to undertake the analysis

prescribed in 20 C.F.R. §404.1527(c)(2) and §416.927(c)(2). This statute provides that if an ALJ decides not to afford the treating physician's opinion controlling weight, there are five factors to be considered in deciding how much weight to give the opinion. These factors are: (1) the nature of the relationship between the plaintiff and the physician; (2) the medical evidence supporting the physician's opinion; (3) the consistency of the physician's opinion with the record as a whole; (4) the physician's specialization; and (5) any other factors that tend to support or contradict the opinion. However, the regulations require only that the ALJ *consider* these factors, not that the ALJ include a factor-by-factor analysis in his decision. *See Hoyle v. Colvin*, civil action no. 4:12cv3464, 2013 WL 3873954 (S.D.Tex., July 23, 2013). In addition, the Fifth Circuit has explained that consideration of these factors is required "in the absence of competing first-hand medical evidence." *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003), *citing Newton v. Apfel*, 209 F.3d 448, 456-58 (5th Cir. 2000). Here, competing first-hand medical evidence existed in the form of Dr. Devulapalli's examination and findings. It was the duty of the ALJ to resolve the conflict in the evidence and the conflict was resolved in favor of Dr. Devulapalli's findings, a decision which the Court cannot second-guess.

Plaintiff also complains that the ALJ discounted the medical records from 1999, when she had back surgery and was given an 18 percent impairment rating. The relevant period in this case began in 2008, nine years later. More importantly, Plaintiff acknowledges that she worked for several years after this back surgery was performed. In *Fraga v. Bowen*, 810 F.2d 1296, 1305 (5th Cir. 1987), the plaintiff asserted that he had suffered from hypertension since 1977, but conceded that he worked from 1957 until 1983 as a steel fitter and inspector. The Fifth Circuit noted that "the evidence indicated that Fraga was able to, and did, perform heavy work for several years while he suffered from hypertension," indicating that the condition was not disabling. In the present case, the evidence shows that Plaintiff performed light-duty work after undergoing back surgery, which is the same type of work which her RFC permits her to do. *See Vaughn v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (citing *Fraga* in holding that "ability to work despite pre-existing condition supports ALJ's finding of not disabled");

*Gibson v. Astrue*, civil action no. 3:11cv733, 2012 WL 10411 (N.D.Tex., January 3, 2012) (citing *Vaughn* in holding that a claimant's ability to work for several years with the same impairments that the claimant alleged to be disabling supports a finding of not disabled). Although Plaintiff appears to argue that the ALJ had a duty to clarify the 1999 medical records, the evidence shows that the facts pertaining to the relevant period, which began in 2008, were fully developed. This contention is without merit.

Finally, Plaintiff notes Dr. Pham opined that "I cannot imagine how she can obtain gainful work at this point." Plaintiff says that "while the ALJ is correct that the Commissioner is responsible for determining if an individual is disabled, opinions from a medical source, especially a treating source, on the ultimate issue of disability must never be ignored," citing 20 C.F.R. §404.1527(e). However, 20 C.F.R. §404.1527(d)(1) and 20 C.F.R. §404.927(d)(1) provide that opinions that a claimant is disabled, including statements such as "unable to work," are not medical opinions but rather opinions on issues reserved to the Commissioner. *Frank*, 326 F.3d at 320. The Commissioner correctly argues that Dr. Pham's statement in this regard is entitled to no special weight. Nor is the fact that the Texas Workforce Commission denied benefits based on that agency's determination that Plaintiff is unable to work. *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. 404.1504 in holding that "the determinations of other agencies, while persuasive, do not bind the Social Security Administration." Plaintiff's claim on this point is without merit.

## VI. CONCLUSION

A claimant bears the burden of proving that he or she suffers from a disability, defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). The Fifth Circuit has explained that the claimant has the burden of proving that he was disabled by showing a "medically determinable" impairment, demonstrated by "medically acceptable

clinical and laboratory diagnostic techniques." *Greenspan v. Shalala*, 38 F.3d 232, 239 (5th Cir. 1994).

In this case, substantial evidence supports the ALJ's finding that the Plaintiff was not under a disability as defined in the Social Security Act from the date of onset until the day the decision was rendered, as set out in 20 C.F.R. 404.1520(g). Because the Plaintiff failed to meet her burden of proof and the ALJ's decision was supported by substantial evidence in the record, it must be affirmed. *Bowling*, 36 F.3d at 435. It is accordingly

**ORDERED** that the decision of the Commissioner is hereby **AFFIRMED** and the above-styled and numbered Social Security action is hereby **DISMISSED** with prejudice.

**SIGNED this 5th day of January, 2014.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE